| | |
|---|---|
| STATE OF MAINE<br>CUMBERLAND, ss. | SUPERIOR COURT<br>CIVIL ACTION<br>DOCKET NO.: CV-20-302 |

| | | |
|---|---|---|
| QUINTON PORTER | ) | |
| | ) | PLAINTIFF'S COMPLAINT |
| Plaintiff, | ) | FOR RETALIATION |
| | ) | |
| v. | ) | |
| | ) | |
| PUBLISHERS CLEARING HOUSE | ) | |
| Defendant. | ) | |

NOW COMES Plaintiff, Quinton Porter ("Plaintiff"), by and through his attorney, the Law Office of Guy D. Loranger, and alleges the following:

### PARTIES AND JURISDICTION

1. Plaintiff Quinton Porter ("Porter") is a resident of the state of Maine.

2. Defendant Publishers Clearing House ("Defendant") is a business with a location in Portland, Maine

3. All acts of which Porter complains took place in the State of Maine, including Cumberland County.

4. Plaintiff requests a jury trial.

### FACTUAL ALLEGATIONS

5. In Beginning in 2016, Porter met on several occasions with Defendant's General Manager to recruit Porter for a position as a lead sales representative.

1

REC'D CUMB CLERKS OFC
JUL 20 '20 PM3:06

6. In early 2018, Defendant continued to recruit Porter. In the recruitment, Defendant made several representations including, but not limited to, the following:

- Porter would sell a new product called Co-branded Sweepstakes.
- Porter would also sell traditional direct/performance products sold by Defendant.
- Every salesperson, except one, had hit their sales target and bonus every quarter.
- 80-85% of deals/campaigns run by Defendant performed to scale and expectations.
- Respondent had 110 million total users, 20 million monthly unique users available for brand advertisers, and sold $1 billion per year of commerce product.

7. In November of 2018, based on Defendant's representations, Porter left his current employment to work for Defendant.

8. After commencing employment, Porter subsequently learned that Defendant had made similar representations to other salespersons. Defendant also provided Porter and other salespersons with literature documenting the subject representations to provide to potential clients as part of the sales pitch.

9. Porter began to discover that many of Defendant's representations were false. Further, even though Porter produced more calls, meetings, and deals than any other salesperson it became clear that he would not come close to hitting his revenue target to receive a quarterly bonus.

10. Porter began to report to upper management of not operating as it had represented to him and it further misrepresented itself to potential clients, essentially complaining of Defendant engaging illegal unfair and/or deceptive trade practices.

11. On April 3, 2019, Defendant directed Porter to speak to Dina Howell ("Howell"). Porter met with Howell the next day.

12. In the meeting, Howell, who identified herself as an "Executive Coach", asked Porter how things were going and assured Porter that he could be "brutally honest". Porter, therefore, recounted Defendant's illegal misrepresentations and false advertising.

13. Porter also described a potentially multi-million-dollar deal with Lending Tree, which Porter and his direct employees sourced, developed, and were in the process of closing. Management, however, took the deal and gave it to a non-salesperson without communicating with Defendant or his employees.

14. On April 8, 2019, Chris McDonough ("McDonough") and Claire Farley met with Porter. In the meeting, McDonough made clear that Porter's reports to Howell illustrated that he "was not committed to the company." McDonough then terminated Porter for his reports.

15. Shortly after Porter's termination, he spoke to Steve Bagdasarian, who had recruited Porter, regarding the Porter's termination. Bagdasarian apologized to Porter for the termination.

16. Bagdasarian also disclosed and admitted that the termination was based upon a memo written by Howell to upper management warning that Porter reports of Defendant's fraudulent marketing practices would "create exposure to the company".

17. The Maine Whistleblower's Protection Act ("WPA") prohibits employers from retaliating against employees who engage in protected activity under the WPA by reporting or complaining of illegal activity.

18. Porter's complaints to upper-management and Howell regarding Defendant's

3

Illegal activity constituted protected activity under the WPA.

19. Defendant's termination of Porter for engaging in protected activity violated the WPA.

20. Porter has complied with all administrative requirements and received a right to sue letter from the MHRC.

## COUNT I: VIOLATION OF THE WPA

21. Porter incorporates by reference the allegations in the above paragraphs.

22. The WPA makes it illegal for an employer to retaliate against an employee because the employee has engaged in protected activity under the Act.

23. Porter engaged in protected activity described *supra.*

24. After Porter engaged in protected activity, Defendant immediately took an adverse action by terminating Porter.

25. A causal link exists between Plaintiff's protected activity and his termination.

26. Defendant did not have good-faith non-retaliatory reason for its adverse employment action.

27. Defendant's assertion regarding the adverse employment action is pretextual.

28. Defendant's actions amounted to retaliation in violation of the WPA.

29. Porter has suffered the damages set forth below.

## COUNT II: NEGLIGENT MISREPRESENTATION

30. Porter incorporates the preceding paragraphs as though set forth in this cause of action.

31. At the time of his recruitment, Defendant made representation to Porter described *supra.*

32. Based on Defendant's representation of the subject material facts, Porter reasonably relied on Defendant's representation and accepted the offer of employment.

4

33. Defendant's representations turned out to be negligent and false.

34. Defendant's negligent misrepresentations caused Porter to suffer the damages set forth below.

### COUNT III: FRAUD

35. Porter incorporates by reference the allegations in the above paragraphs.

36. At the time of his recruitment, Defendant made false representation of materials to Porter as described *supra*.

37. Defendant knew the representations were false or made in reckless disregard whether the statements were true or false.

38. Defendant made the representations to induce Porter to accept employment with Defendant.

39. Porter reasonably relied on Defendant's false representations and accepted the offer of employment.

40. Defendant's fraud caused Porter to suffer the damages set forth below.

WHEREFORE, Porter respectfully requests that this Honorable Court (1) enter judgment in favor of the Porter and (2) award damages sufficiently large to compensate for damages he has suffered as a result of Defendants' conduct including, but not limited to, damages for general and non-economic damages, economic damages, pre-judgment and post- judgment interest, lost wages, punitive damages, injunctive relief, costs of this suit, including reasonable attorney fees and costs, and such further relief the Court may deem proper.

Dated: July 17, 2020

Guy D. Loranger, Esq., Bar No. 9294

Attorney for Plaintiff

Law Office of Guy D. Loranger
1 Granny Smith Court, Suite 3
Old Orchard Beach, ME  04064
(207)937-3257
guy@lorangerlaw.com